## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

NORAIR ENGINEERING CORP. )
 337 Brightseat Rd # 200 )
 Landover, MD 20785 )
 )
  Plaintiff )
 )
  v. ) Case No. __16-1585__
 )
DISTRICT OF COLUMBIA WATER )
AND SEWER AUTHORITY )
 5000 Overlook Ave. SW )
 Washington, DC 20032 )
 )
  Defendant )
_____ )

## **COMPLAINT**

Plaintiff, Norair Engineering Corp. (Plaintiff or Norair), by and through its undersigned counsel, states and alleges as follows:

### **Introduction**

1. Norair brings this Complaint for declaratory relief, preliminary injunctive relief, and permanent injunctive relief to redress Defendant District of Columbia Water and Sewer Authority's (Defendant or DC Water) violations of the Fifth Amendment of the U.S. Constitution and District of Columbia Water and Sewer Authority Procurement Regulations (21 DCMR 5300 *et seq*.).

2. DC Water violates the Equal Protection Clause of the Fifth Amendment by applying a mandatory race and gender based quota system in a government procurement that does not satisfy the rigors of strict scrutiny and by misinterpreting the U.S. Environmental Protection Agency's (EPA) fair share objectives as requiring the imposition of this mandatory quota.

3. DC Water violates the District of Columbia Water and Sewer Authority Procurement Regulations (the Procurement Regulations) by finding Norair's bid – which

was the lowest bid under Invitation for Bid (IFB) No. 150030 – non-responsive and thus, finding Norair ineligible to receive a contract award, due to Norair's inability to satisfy a requirement not solicited (*i.e.*, DC Water's unsolicited and illegal quota requirements).

## Jurisdiction

4.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the matter in controversy exceeds the sum or value of $75,000.

5.      The matter in controversy exceeds the sum or value of $75,000 because the price of the contract resulting from IFB No. 150030 is over $18 million and Norair is entitled to the contract if it prevails on its claims.

6.      The Court also has subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. §1367(a) because Count I of this action arises under the U.S. Constitution and Count II is related to Count I and forms part of the same case or controversy.

7.      This Court has personal jurisdiction over DC Water because DC Water is a District of Columbia entity with its principal place of business in the District of Columbia.

8.      This Court is the proper venue because it is the federal court sitting within the District of Columbia and because bids were solicited and opened in the District of Columbia and the contract at issue is to be performed within the District of Columbia.

9.      DC Water's Procurement Manual provides that "[a] protestor may appeal a denial of a protest by the Contracting Officer to a court of competent jurisdiction." Procurement Manual Chapter 28.8.

10.     The Contracting Officer denied Norair's protest on July 26, 2016, Norair received the denial on July 29, 2016, and this Court is a court of competent jurisdiction.

11.     As such, this Court may render a decision on the merits of Norair's Complaint.

## Parties

12.     Norair is an entity incorporated in the State of New Jersey and has its principal place of business in the State of Maryland.

13.     Norair's business consists of providing general and mechanical contracting services to clients; Norair's services include installing process piping, plumbing, and HVAC systems, and renovating and repairing existing owner occupied and operating plants and buildings.

14.     Defendant is an independent agency of the District of Columbia tasked with providing retail water and wastewater service to the District of Columbia.

## Factual and Procedural Background

15.     This Complaint challenges DC Water's decision to find Norair's bid non-responsive and ineligible for award of a contract under IFB No. 150030 due to Norair's inability to subcontract 32% of the work to MBEs and 6% of the work to WBEs (despite demonstrating good faith efforts to utilize MBEs and WBEs), in violation of the U.S. Constitution and the Procurement Regulations.

### IFB No. 150030

16.     On March 20, 2016, DC Water released IFB No. 150030 soliciting bids for contractors to rehabilitate and upgrade wastewater pumps and perform related services.

17.     A contract award was to be made to the responsible offeror submitting lowest-priced, responsive bid.  21 DCMR § 5331.1.

3

18.     According to the Procurement Regulations, "[a] responsive bid is a response to a solicitation which conforms in all material respects to the solicitation."  21 DCMR § 5312.3.

19.     The IFB provided that:

> This project may be funded in part by the U.S. Environmental Protection Agency (EPA).  A Fair Share Objective for Minority and Women's Business Enterprises participation in this work of 32% and 6%, respectively, has been established.  The program requirements are fully defined in USEPA's "Participation by Disadvantaged Enterprises in Procurement under EPA Financial Assistance Agreements – May 27, 2008".

<u>EPA Rules Provide that Fair Share Objectives are Not to be Treated as Quotas and Establish No Penalties for Not Meeting Objectives</u>

20.     EPA's rules for Participation by Disadvantaged Enterprises in Procurement under EPA Financial Assistance Agreements are provided at 40 C.F.R. § Part 33.

21.     According to the applicable EPA regulations:

> A fair share objective is an objective based on the capacity and availability of qualified, certified MBE and WBEs in the relevant geographic market for the procurement categories of construction, equipment, services and supplies compared to the number of all qualified entities in the same market for the same procurement categories, adjusted, as appropriate, to reflect the level of MBE and WBE participation expected absent the effects of discrimination.  ***A fair share objective is not a quota.***

40 C.F.R. § 33.403 (emphasis added).

22.     Recipients of grant funds cannot be penalized or deemed non-complaint with EPA grant rules "solely because its MBE or WBE participation does not meet its applicable fair share objective" where the recipient makes "good faith efforts" to meet objectives, as defined by EPA regulations.  40 C.F.R. § 33.410.

4

23.     As such, the EPA regulations, on their face, do not support the creation of a mandatory quota or support the rejection of bids due to the bidder's inability to meet objectives.

24.     The IFB merely incorporates EPA grant requirements, and therefore, also does not put bidders on notice of any mandatory quota.

25.     Nonetheless, as further explained in paragraphs 45 through 93 below, DC Water subsequently treated the fair share objectives as a mandatory quota and disqualified Norair from competition for its failure to meet the quota.

26.     *If* EPA regulations or DC Water's IFB ***had*** included a penalty for failing to meet MBE or WBE participation objectives, then the EPA regulations and/or IFB create an unconstitutional and illegal race and gender based quota system.  *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995) (applying strict scrutiny to program granting monetary incentives to government contractors who subcontract work to companies controlled by "socially and economically disadvantaged individuals"); *see also City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1983) (finding plan requiring government contractors to subcontract at least 30% of the dollar amount of each contract to one or more Minority Business Enterprises" unconstitutional).

<u>Grantees Establish Full Compliance with Fair Share Objectives by<br>Making Six Good Faith Efforts</u>

27.     EPA regulations provide for six types of good faith efforts to be made by grantees (in this case, DC Water) and, where subcontracting opportunities exist, the prime contractor:

> (a)     Ensure DBEs are made aware of contracting opportunities to the fullest extent practicable through outreach and recruitment activities. For Indian Tribal, State and Local and Government recipients, this will include placing DBEs on

5

solicitation lists and soliciting them whenever they are potential sources.

(b) Make information on forthcoming opportunities available to DBEs and arrange time frames for contracts and establish delivery schedules, where the requirements permit, in a way that encourages and facilitates participation by DBEs in the competitive process. This includes, whenever possible, posting solicitations for bids or proposals for a minimum of 30 calendar days before the bid or proposal closing date.

(c) Consider in the contracting process whether firms competing for large contracts could subcontract with DBEs. For Indian Tribal, State and local Government recipients, this will include dividing total requirements when economically feasible into smaller tasks or quantities to permit maximum participation by DBEs in the competitive process.

(d) Encourage contracting with a consortium of DBEs when a contract is too large for one of these firms to handle individually.

(e) Use the services and assistance of the SBA and the Minority Business Development Agency of the Department of Commerce.

(f) If the prime contractor awards subcontracts, require the prime contractor to take the steps in paragraphs (a) through (e) of this section.

40 C.F.R. § 33.301.

28. For prime contractors, the duties can be summarized as: (a) making MBEs/WBEs aware of opportunities through outreach; (b) contacting MBEs/WBEs well in advance of bid day; (c) breaking up scopes of work into smaller pieces, where possible; and (d) using other agency resources to find additional, eligible businesses.

29. A prime contractor making and demonstrating the good faith efforts noted in 40 C.F.R. § 33.301 complies with the EPA grant rules, and by extension, the requirements of this IFB for MBE and WBE utilization.

<u>Norair Submits the Lowest-Priced Responsive Bid,</u>
<u>But is Unlawfully Denied the Contract Award</u>

6

30.     Bids for the IFB were due and publically opened on April 27, 2016.

31.     Norair submitted a timely bid and was the lowest priced bidder.

32.     Norair's bid price was $18,428,895.

33.     Norair's bid included a completed Certification of Outreach Efforts form that attested to Norair's awareness of the fair share objectives and requirement to employ good faith efforts during the bid phase.  *See* Exhibit A.

34.     Norair's bid also included an April 25, 2016, letter describing the good-faith efforts Norair had taken to meet objectives and attaching a list of twenty (20) MBE and WBE subcontractors Norair had contacted.  *See* Exhibit B.

35.     The April 25th  letter provided that Norair: (1) "made direct contact with DBE firms that it identified from industry sources by email, follow up email and follow up phone calls"; (2) "made its contacts in sufficient time to obtain a response, approximately 30 days from receipt of the [solicitation] to the bid date"; (3) "identified small contract opportunities by dividing some of the work into smaller packages"; and (4) "availed itself of local DBE agencies to identify potential subcontractors".  *See* Exhibit B.

36.     These efforts track the requirements of 40 C.F.R. § 33.301.

37.     Of the twenty (20) MBE/WBE subcontractors contacted by Norair, only three (3) submitted bids to Norair on or before bid day; as noted in its bid, Norair intended to award subcontracts to those three firms if awarded the contract.

38.     Norair's bid included a completed DBE Subcontractor Utilization Form showing that Norair intended to subcontract approximately $1.26 million to these three DBE firms.  *See* Exhibit C.

39.     Despite submitting the lowest bid and including information demonstrating that it had made good faith efforts to fulfill MBE/WBE objectives, DC Water refused to award Norair the contract.

40.     DC Water informed Norair of its disqualification on May 18, 2016.

41.     Although DC Water asserted that Norair failed to demonstrate all good faith efforts, Norair's bid did, in fact, document all good faith efforts taken.

42.     Based on discussions Norair's President had with DC Water representatives between April 29, 2015 and May 18, 2015, and as further explained in paragraphs 45 through 93 below, Norair understands that DC Water's purported rejection of the bid for failure to make good faith efforts is pretexual and that the bid was actually rejected for Norair's inability to meet the 32% and 6% fair share objectives by bid day.

43.     In effect, DC Water attempted to make EPA's fair share goals mandatory, thereby creating and enforcing an illegal race and gender based quota system.

44.     DC Water also violated its own Procurement Regulations by finding Norair's bid non-responsive for failing to provide something that was not required by the IFB (*i.e.*, 100% satisfaction of the "goals" – which DC Water construed to be a mandatory quota).

<u>DC Water Denies Norair's Protest</u>

45.     Norair submitted a timely bid protest to the Contracting Officer challenging its disqualification within five (5) calendar days of May 18, 2016 (the date it was informed of its improper disqualification), as required by Procurement Regulations.  *See* 21 DCMR § 5351.1.  *See* Exhibit D.

46.     On June 2, 2016, Norair received a letter from Leonard Benson, Chief Engineer for DC Water, stating that DC Water considered Norair's protest was premature

because the subject contract had not yet been awarded;[1] the letter further stated that

Norair's protest would be restored and addressed upon contract award.  *See* Exhibit E.

47.     Subsequently, Norair and its legal counsel attempted to contact DC Water –

multiple times – to obtain a status update on the contract and the protest.

48.     On each occasion, DC Water failed to respond.

49.     However, it now appears that the contract was awarded to another offeror,

American Contracting & Environmental Services, Inc. through a resolution executed on

July 7, 2016.

50.     It also appears that DC Water did restore Norair's protest, as the Contracting

Officer issued a final decision on the protest dated July 26, 2016 and received by Norair on

July 29, 2016.  *See* Exhibit F.

51.     The Contracting Officer denied the protest.

52.     The decision letter asserts that the Contracting Officer's denial is based on

the following determinations: (a) Norair's Certification of Outreach Efforts form was

incomplete; (b) Norair's documentation concerning its telephone and email outreach was

incomplete; (c) Norair did not use dedicated MBE/WBE websites for finding subcontractors;

and (d) despite being notified prior to bid opening to correct deficiencies, Norair did not

"correct this deficiency."

53.     When each of these supposed issues are examined, it becomes clear that DC

Water's denial of the protest for these supposed "failures" to make good faith efforts is

pretextual and that the true reason for DC Water finding the bid non-responsive is that

---

[1] DC Water's response was likely legally incorrect, as the Procurement Regulations and DC
Water Procurement Manual allow for pre-award protests and mandate that a protest be
filed within five days of the date on which a protestor knew or should have known the basis
of its protest.  DC Water Procurement Manual, Chapter 28.4; 21 DCMR § 5351.1.

Norair was unable to reach the 32% and 6% "goals" DC Water actually considered to be quotas for the procurement.

<u>Norair's Certification of Outreach Form was Complete</u>

54.     The Contracting Officer's denial provides that:

> Specifically, Norair's bid submission provided Certifications of Outreach Efforts, signed by Norair that named MBE/WBE subcontractors that had agreed to perform work on this project. Several of these certifications were incomplete as to the material sections of work to be completed. The corresponding named MBE/WBE subs are required to provide their acknowledgement of their intent to subcontract with Norair. Here, only two subs submitted their intent.

55.     Norair did submit with its bid a DBE Subcontractor Utilization Form listing (in the small amount of space provided) its proposed MBE/WBE subcontractors and the material sections of work to be completed by those subcontractors, as follows:

| Company | Type of Work to Be Performed | Estimated Dollar Amount | Currently Certified as an MBE or WBE? |
|---|---|---|---|
| TRIJAY [Systems Inc.], Line Lexington PA | Instrumentation | $192,500 | MBE |
| Blue Ridge [Inc.], Camp Springs MD | Storm Drains | [$]1,048,000 | MBE |
| Best Masonry [Construction, Inc.], Beltsville MD | Masonry | No Bid | MBE |
| DeLeon Access Floor[s], Inc., Jessup MD | Flooring | [$]18,600 | MBE |

*See* Exhibit C.

56.     No material information was omitted concerning the "material sections of work to be completed" by these firms, and the Contracting Officer's stated reason for denying the protest lacks any support in the record.

10

57.     Norair submitted completed Intent to Subcontract forms for TRIJAY, Blue Ridge, and DeLeon.  *See* Exhibit G.

58.     Contrary to the Contracting Officer's representation, Norair and all three subcontractors who submitted bids to Norair completed the intent forms.

59.     As noted on the Utilization Form itself, Best Masonry had submitted no bid to Norair by the bid opening date, and quite obviously, would not have returned to Norair any intent forms prior to submitting a bid.  *See* Exhibit C.

60.     This does not make Norair's bid defective however, as the IFB required that bidders demonstrate making "good faith efforts" at compliance, but did not require bidders to achieve the 32% and 6% goals.

61.     Because the lack of an intent form for Best Masonry (a subcontractor who had not submitted a bid and was not included in the overall dollar value calculation for MBE/WBE subcontracting) does not reflect Norair's good faith efforts to encourage Best Masonry (and others) to submit a bid, the lack of an intent form for Best Masonry does not render Norair's bid non-conforming to any element (no less a ***material*** element) of the solicitation.

62.     At best, the lack of an intent form from Best Masonry (a subcontractor that was not included in the overall dollar value calculation for MBE/WBE subcontracting) constitutes a minor informality or irregularity in the bid and DC Water should have either waived the irregularity or permitted Norair to correct it.  *See* DC Water Procurement Manual, Chapter 6.3.8 ("A minor informality or irregularity is one that is a matter of form and not of substance or that pertains to some immaterial or inconsequential defect or variation of a bid form the exact requirement of the solicitation.  The Contracting Officer shall give the bidder an opportunity to cure any deficiency resulting from a minor

11

informality or irregularity in a bid, or waive the deficiency provided the waiver will not

violate the principals of the competitive procurement.").


Norair's Telephone and Email Records were Sufficiently Complete to
Show Contact with 20 MBE/WBE Firms

63.     The Contracting Officer's denial provides that: "[a]dditionally, Norair used

telephone calls and email to contact subs, however, the supporting documentation in that

regard is incomplete."  *See* Exhibit F.

64.     The Contracting Officer fails to specify what part of the record he found

"incomplete."

65.     As part of its bid package, Norair included a spreadsheet listing: the name of

each MBE/WBE contractor it contacted, the scope of work that subcontractor was

considered for, the type of contact initiated by Norair (including the date of the attempted

contact), the subcontractor's response (if any), and a log of whether that subcontractor

returned the required forms.  *See* Exhibit B.

66.     For example, the spreadsheet provides that Norair contacted Axis Company,

Inc. (formerly known as Titan Construction Services) in regards to paint and lead

abatement work (described in Section 02 83 19 of the IFB).

67.     The spreadsheet provides that Norair left voice messages for Axis Company

on April 14th and April 21st and emailed Axis Company on March 29th, April 4th, and April

14th.

68.     The spreadsheet finally provides that Axis Company made no response to any

of these attempted contacts and did not return any of the required forms.

69.     Similar information was documented for each of the other nineteen (19) MBE/WBE firms Norair contacted.

70.     Based on the foregoing, Norair submitted detailed information concerning its efforts to contact MBE and WBE firms, and the Contracting Officer's determination that the support was "incomplete" lacks any support in the record.

<u>Norair Used Dedicated MBE/DBE Websites to Find Eligible Subcontractors</u>

71.     In the April 25th letter Norair included with its bid package, Norair provided that it had "made direct contact with DBE firms that it identified from industry sources" and "availed itself of local DBE agencies to identify potential subcontractors." *See* Exhibit B.

72.     The Contracting Officer's denial acknowledges Norair's contention that "DBE firms were made aware of the opportunity, contacts were established for timely proposal preparation, tasks were identified and broken down, and publicized lists of DCE firms were consulted, including DC DSLBD, MDOT, WSSC, Blue Book and Norair's internal list developed over the years.  In sum, Norair insists that the six steps were followed." *See* Exhibit F.

73.     Nonetheless, on the very next page, the Contracting Officer ignores this information, finding that "[d]edicated MBE/WBE websites for finding subs were not used." *See* Exhibit F.

74.     Initially, DC Water's decision to reject Norair's bid is erroneous because the six good faith efforts do not include any requirement to utilize "[d]edicated MBE/WBE websites for finding subs."

ACTIVE 41482130v2 08/04/2016

75.     Furthermore, all of the websites Norair consulted (and which the Contracting Officer names in her decision) are dedicated websites for finding MBE and WBE businesses.

76.     DC's Department of Small and Local Business Development website (DC DSLBD) contains a database of all certified local, small, and disadvantaged business enterprises and as such, constitutes a dedicated MBE/WBE website.

77.     The website for the Office of Maryland Business Enterprise (MDOT) also includes a directory of certified firms and as such, constitutes a dedicated MBE/WBE website.

78.     The website for the Washington Suburban Sanitary Commission (WSSC) also provides information concerning the MBE program and as such, constitutes a dedicated MBE/WBE website.

79.     The BlueBook.com (Blue Book) contains a directory of registered MBE and WBE contractors in each specialty trade located in the Washington, DC area and as such, constitutes a dedicated MBE/WBE website.

80.     By consulting with each of these websites prior to bidding the work, Norair utilized "[d]edicated MBE/WBE websites" and the Contracting Officer's unsupported contention that Norair failed to do so is clearly erroneous.

Norair Took All Reasonable Efforts to Provide<br>
More Information Upon DC Water's ***Post-Bid Opening*** Request

81.     Finally, the Contracting Officer's decision asserts that "Norair was contacted ***prior to bid opening*** and informed of the deficient outreach efforts.  Norair, however failed to correct this deficiency."  *See* Exhibit F (emphasis added).

14

82.     This purported pre-bid contact never occurred, and it is unclear how DC Water could have had knowledge of any "deficiencies" in Norair's bid prior to receiving Norair's bid.

83.     On April 29th and *after* opening Norair's bid, a representative for DC Water, Mr. Bryan Campbell, did call Norair to inform Norair that its ***inability to meet the 32% and 6% fair share objectives*** (not its good faith efforts) was considered a problem and suggested that Norair contact another DC Water representative, Mr. Gus Bass.  *See* Exhibit H.

84.     Norair's President, Mr. Richard Norair, Jr., called Mr. Bass on May 2nd.  *See* Exhibit H.

85.     Mr. Bass expressed to Norair that DC Water would accept a supplemental submission from Norair for Norair to ***increase its MBE/WBE subcontracting percentages***; again, Norair's good faith efforts were not questioned.  *See* Exhibit H.

86.     On May 10, 2016, Mr. Norair and Mr. Bass participated in another telephone call; during the call Mr. Bass expressed that if Norair could not meet the 32% and 6% "goals" in its supplemental submission provided to DC Water by close of business that day, then Norair would not receive a contract award.  *See* Exhibit H.

87.     Norair did provide a supplemental submission by the end of the business day on May 10th and (as a result of the additional two weeks of outreach) was able to increase its percentages to meet the 32% and 6% "goals."  *See* Exhibit H.

88.     Mr. Bass promised to review the supplemental submission and expressed an initial opinion that this should be satisfactory.  *See* Exhibit H.

15

89.     However, on May 18th DC Water again called Norair and informed Norair that the supplemental submission would not be considered and that a decision had already been made to find Norair's bid non-responsive.  *See* Exhibit H.

90.     Contrary to the Contracting Officer's contention, therefore, Norair did take reasonable efforts to address DC Water's concern with the bid (first raised with Norair **post-bid opening and not pre-bid opening, as asserted by the Contracting Officer**).

91.     Norair's inability to meet the 32% and 6% goals expressed in the IFB cannot be considered a "deficiency".

92.     Nonetheless, Norair took all reasonable efforts to make additional outreach and increase its percentages when informed by Mr. Campbell and Mr. Bass that Norair would not receive an award if it did not meet the percentages.

93.     Despite these efforts, DC Water reneged on its promise to consider a supplemental submission and unlawfully denied Norair a contract award based on DC Water's determination to treat the fair share goals as a rigid quota.

## COUNT I
### (Declaratory and Injunctive Relief –
### Violation of Fifth Amendment's Equal Protection Clause)

94.     Norair re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 93 above as if fully set forth herein.

95.     Norair made the six good faith efforts required under EPA regulations to show compliance with EPA grant rules for MBE and WBE utilization.

96.     Norair's bid reflected the efforts Norair took to make these good faith efforts, and included all documents and certifications required by the IFB related to compliance with the EPA grant rules for MBE and WBE utilization.

16

97.     Norair's bid complied with the IFB requirements in all material respects, and as such, should have been deemed responsive.

98.     Regardless, DC Water found Norair's bid non-responsive due to Norair's inability to meet the 32% and 6% fair share objectives.

99.     This decision amounts to DC Water's determination to treat the EPA's fair share objectives as a quota for using a certain percentage of minority-owned businesses and women-owned businesses to perform public work projects (such as, but likely not limited to, the instant contract).[2]

100.    DC Water's quota for using minority-owned business and women-owned businesses to perform public work projects is not narrowly tailored to remedy the effects of prior discrimination.

101.    As such, the quota is unconstitutional under the Equal Protection Clause of the Fifth Amendment, both facially and as applied to Norair.

102.    Norair will suffer irreparable injury if an injunction is not granted because American Contracting & Environmental Services, Inc. will be permitted to perform work on a contract that would have been awarded to Norair had Constitutional and regulatory requirements been followed.

103.    If American Contracting & Environmental Services, Inc. is permitted to perform, then Norair will be denied the ability to perform work that should rightfully have

---

[2] Again, EPA's regulations, on their face, provide that the fair share objectives are not a quota.  The objectives are not a quota, under the regulatory scheme adopted by EPA because EPA applies no penalty or other negative consequence for a grantee's failure to meet the objectives.  However, DC Water has conveyed – through disqualifying Norair – that, for purposes of this IFB (and likely others), DC Water will issue penalties (specifically, the penalty of disqualification) for an offeror's inability to meet the objectives.  As such, DC Water has converted the fair share objectives from a mere goal into a rigid quota.

been contracted to Norair, and any subsequent victory by Norair in these proceedings will bear no results.

104.    The harm to Norair in this Court not granting the injunction outweighs any harm to DC Water  and any other interested party because the only harm likely to occur is a slight delay in DC Water having the work performed.

105.    Because this potential harm was caused by DC Water, itself, due to DC Water improperly denying Norair the contract, this harm cannot outweigh the substantial harm to Norair in losing the contract.

106.    The public interest is served by this Court granting an injunction because the public has an interest in ensuring that: (a) Constitutional requirements are followed; (b) procurement regulations are followed; and (c) DC Water receives a fair and reasonable price for services.

107.    DC Water's policy of treating EPA fair share objectives as a mandatory quota has potentially far-reaching consequences for other contracts awarded by DC Water.

108.    Specifically, this policy will result in additional unfair treatment of contractors based on race and gender.

109.    This policy will also result in DC Water (and, by extension, the taxpayers) paying higher prices for the same services, as more low-bidders will be disqualified based on their inability to meet DC Water's unconstitutional quota.

110.    As such, the public interest is best served by this Court enjoining the award to American Contracting & Environmental Services, Inc. and ordering that Norair be awarded the contract and enjoining DC Water from further implementing its quota system.

## COUNT II
### (Declaratory and Injunctive Relief –
### Violation of 21 DCMR § 5312.3 and 21 DCMR § 5331.1)

ACTIVE 41482130v2 08/04/2016

111. Norair re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 110 above as if fully set forth herein.

112. 21 DCMR § 5312.3 provides that "[a] responsive bid is a response to a solicitation which conforms in all material respects to the solicitation."

113. 21 DCMR § 5331.1 provides that, when an IFB is issued, DC Water must award the contract to the responsible bidder who submits the lowest responsive bid.

114. Norair is a responsible bidder (a fact not challenged by DC Water).

115. Norair submitted a bid that conformed in all material respects to the solicitation.

116. Norair submitted the lowest bid.

117. Therefore, Norair should have been awarded the contract under 21 DCMR §5331.1.

118. Nonetheless, DC Water deemed Norair's bid non-responsive, citing to pretextual reasons, but actually rejected the bid because the bid did not reflect Norair's ability to meet the 32% and 6% fair share objectives.

119. Meeting the fair share objectives was not a requirement of the solicitation.

120. Meeting the fair share objectives ***could not be*** a requirement of the solicitation because: (a) EPA regulations (as incorporated into the solicitation by reference) provide that the fair share objectives are not a quota; (b) EPA regulations (as incorporated into the solicitation by reference) provide that there are no penalties for not meeting the fair share objectives and (c) treating the fair share objectives as a quota violates the Equal Protection Clause of the Fifth Amendment because the quota is not narrowly tailored to remedy the effects of prior discrimination.

19

121.     By deeming Norair's bid non-responsive despite the bid conforming to the solicitation requirements, DC Water violates 21 DCMR § 5312.3.

122.     By denying Norair (a responsible bidder submitting the lowest-priced responsive bid) the contract, DC Water violates 21 DCMR § 5331.1.

123.     Norair is entitled to an injunction remedying this violation for the reasons set forth in paragraphs 102 through 110.

## Relief Requested

WHEREFORE, Norair requests that the Court grant the following relief:

1.     Declaratory judgment that the contract be awarded to Norair as the responsible bidder submitting the lowest-priced, responsive bid;

2.     Declaratory judgment that DC Water misconstrues the requirements of the EPA grant program, its own Procurement Regulations, and the IFB by finding that bidders' meeting the fair share objectives is a mandatory requirement for award;

3.     A preliminary and permanent injunction disallowing DC Water from permitting American Contracting & Environmental Services, Inc. to perform work under the contract;

4.     A permanent injunction disallowing DC Water from applying mandatory race-based and/or gender-based quotas in this procurement and future procurements;

5.     A permanent injunction directing DC Water to cancel the award to American Contracting & Environmental Services, Inc. and to award the contract to Norair as the responsible bidder submitting the lowest-priced, responsive bid; and

6.     Such other relief as the Court deems just and proper.

Submitted this 4th day of August, 2016.

/s Dirk Haire_____
Dirk Haire (Bar #458392)

**Fox Rothschild LLP**
1030 15th Street, NW
Suite 380 East
Washington, DC 20005
Phone: (202) 461-3114
Fax: (202) 461-3102
dhaire@foxrothschild.com
*Attorney for Norair Engineering Corp.*

## CERTIFICATE OF SERVICE

I certify that on this 4th day of August, 2016, a copy of this Complaint was mailed, via certified U.S. mail, to Henderson J. Brown, IV Esq., General Counsel for Defendant, at the following address:

Henderson J. Brown, IV, Esq.
General Counsel
District of Columbia Water and Sewer Authority
5000 Overlook Ave. SW
Washington, DC 20032

/s Dirk Haire_____
Dirk Haire (Bar #458392)

21