## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NORAIR ENGINEERING CORP.,

        *Plaintiff*,

   v.

DISTRICT OF COLUMBIA WATER AND
SEWER AUTHORITY,

        *Defendant.*

No. 16-cv-1585 (DLF)

## <u>MEMORANDUM OPINION</u>

Norair Engineering Corporation is a general and mechanical contractor. The District of Columbia Water and Sewer Authority ("DC Water") provides drinking water and wastewater services and routinely grants construction contracts to support these services. DC Water rejected Norair's bid for one such contract. Norair challenges that decision as irrational and unlawful under the District of Columbia Administrative Procedure Act (D.C. APA) and as unconstitutional under the Equal Protection Clause of the United States Constitution. Before the Court are Norair's Motion for Summary Judgment, Dkt. 53, and DC Water's Cross-Motion for Summary Judgment, Dkt. 54. For the following reasons, the Court will deny Norair's motion and grant DC Water's cross-motion.

I.    **BACKGROUND**[1]

A.    **The Invitation for Bids**

On February 18, 2016, DC Water issued Invitation for Bids No. 150030 (the "IFB").
AR1571.[2]  The IFB was to upgrade Raw Wastewater Pump Station Number 2 at the Blue Plains
Advanced Wastewater Treatment Facility in Washington, D.C.  *Id.*  The IFB explained that DC
Water would award a contract, "if any, to the lowest qualified, responsible and responsive
bidder, as determined by DC Water."  AR1584.  It warned that a bidder's failure to comply with
the IFB's substantive and procedural requirements "may be cause to declare the bid to be
non-responsive" and reserved DC Water's "right to reject" any "nonresponsive" or
"nonconforming" bids. *Id.* at 1584–85.

Among the IFB's requirements was compliance with the U.S. Environmental Protection
Agency's  Disadvantaged Business Enterprise ("DBE") Program rules.  AR1595.  Under those
rules, DC Water specified a "fair share objective" for minority business enterprise ("MBE") and
women business enterprise ("WBE") participation in the project.  40 C.F.R. § 33.403.  A fair
share objective is a target percentage for MBE and WBE participation in the project.  *Id.*  It is
calculated by dividing the proposed bid's total value by the value of any MBE and WBE
subcontracts included in the bid.  The fair share objective for this project was 32% MBE and 6%
WBE participation.  AR1595.  A fair share objective is "not a quota," 40 C.F.R. § 33.403, and a

---

[1] In recounting the factual background, the Court cites both to the administrative record and to
other exhibits.  But in reviewing Norair's administrative claims, the Court has limited its review
to the administrative record, as Norair concedes the Court must.  *See China Trade Ctr., LLC v.
Washington Metro. Area Transit Auth.*, 34 F. Supp. 2d 67, 70 (D.D.C. 1999); Pl.'s Mem. at 21.

[2] "AR" citations reference the Joint Appendix of Administrative Record Citations, Dkt. 64-1.

grant "recipient cannot be penalized . . . solely because its MBE or WBE participation does not meet its applicable fair share objective."  *Id.* § 33.410.

Even so, the DBE Program requires bidders like Norair to try to meet the fair share objectives through six so-called "good faith efforts."  40 C.F.R. § 33.301.  These six requirements ensure that DBEs know about subcontracting opportunities and that bidders make genuine attempts to contact DBEs.  *Id.*  The IFB incorporated the good faith efforts, instructing bidders to "be aware of the requirement to employ the six Good Faith Efforts during bidding" and to place "[p]articular emphasis. . . on employing the six Good Faith Efforts."  AR1595.  The good faith efforts are:

> (a) Ensure DBEs are made aware of contracting opportunities to the fullest extent practicable through outreach and recruitment activities. . . .
>
> (b) Make information on forthcoming opportunities available to DBEs and arrange time frames for contracts and establish delivery schedules, where the requirements permit, in a way that encourages and facilitates participation by DBEs in the competitive process. This includes, whenever possible, posting solicitations for bids or proposals for a minimum of 30 calendar days before the bid or proposal closing date.
>
> (c) Consider in the contracting process whether firms competing for large contracts could subcontract with DBEs. . . . [T]his will include dividing total requirements when economically feasible into smaller tasks or quantities to permit maximum participation by DBEs in the competitive process.
>
> (d) Encourage contracting with a consortium of DBEs when a contract is too large for one of these firms to handle individually.
>
> (e) Use the services and assistance of the [Small Business Administration] and the Minority Business Development Agency of the Department of Commerce.
>
> (f) If the prime contractor awards subcontracts, require the prime contractor to take steps in paragraphs (a) through (e) of this section.

40 C.F.R. § 33.301.  In addition, the IFB required contractors to "contact at a minimum" the "District Department of Transportation," the "US Department of Transportation," and the "Small Business Administration" during "the search for Disadvantaged Business Enterprises."  AR1595.

In addition to requiring compliance with these outreach efforts, the IFB also required contractors to document their compliance by "submit[ting] with the bid . . . their plan and documentation of their WBE/MBE outreach plan efforts to comply with the Fair Share Objectives."  *Id.*  The IFB also told bidders to "[i]include in the submitted documentation minority businesses and women business enterprises that were solicited as potential subcontracting sources and the bidder's evaluation of each MBE and WBE subcontractor proposal received."  *Id.*  And it warned that "[f]ailure to comply with these requirements may be cause to declare the bid to be non-responsive."  *Id.*

## B.    Norair's Bid

The bid opened for submissions on April 27, 2016.  AR6666.  Four bidders responded, and Norair's bid was the lowest-priced.  AR3780.  In its bid package, Norair certified that the project would include four MBE subcontractors—Trujay Systems, Blue Ridge, Best Masonry, and DeLeon Access Floors—and no WBE subcontractors.  AR2939.  Based on Norair's estimated value for each subcontract, this resulted in a participation rate of 6.83% for MBEs and 0% for WBEs.  *See* AR2932–35.

Norair also certified that it was aware of the fair share objectives, the requirement to use the good faith efforts to achieve these objectives, and the IFB's directive to document compliance with the good faith efforts.  AR2926.  To document this compliance, Norair's bid package included:

- A signed "Certification of Outreach Efforts" form acknowledging that Norair had complied with the good faith efforts.  AR2926.

- A "Bid Document Checklist," which indicated which of the required forms that Norair had submitted. AR2927–28.

- A letter stating that Norair "made a good faith effort to obtain DBE participation on this project" by: making "direct contact with DBE firms that it identified from industry sources by email, follow up email and follow up phone calls"; making "its contacts in sufficient time to obtain a response, approximately 30 days from receipt of the package to the bid date"; identifying "small contract opportunities by dividing some of the work into smaller packages"; and "avail[ing] itself of local DBE agencies to identify potential subcontractors." AR2963.

- A chart called "DBE Contacts Made" that Norair included "[a]s back-up" to this letter. AR2964–65. The chart listed 20 prospective subcontractors that Norair had contacted along with the scope of that contractor's possible work, the dates and types of contacts made, and the subcontractor's response. *Id.*

But Norair's bid omitted other information supporting its compliance with the good faith efforts and the IFB's DBE outreach requirements, including:

- Notation in its DBE Contacts Made chart to "identify whether the contacted entities were MBE or WBEs." Pl.'s Statement of Disputed Material Facts at 15, Dkt. 68.

- "[D]ocuments relating to its attempts to contract with a consortium of M/WBE subcontractors." *Id.* at 13.

- "Documentation that it utilized the Small Business Administration (SBA) or the Minority Business Development Agency of the U.S. Department of Commerce." *Id.* at 14

- Documentation that Norair contacted the District Department of Transportation and the U.S. Department of Transportation during the search for DBEs. *See generally* AR2916–88.

- "[D]ocumentation that it had advertised MBE/WBE subcontracting opportunities in a newspaper, trade publication, online portal, or website." Pl.'s Statement of Disputed Material Facts at 12.

- "[D]ocuments relating to [Norair's] attempts to contract with a consortium of M/WBE subcontractors" or reasoning for not contracting a consortium of DBEs. *Id.* at 13.

Norair contends that these deficiencies and omissions did not render its bid nonresponsive. *See* Pl.'s Statement of Disputed Material Facts at 13–22.

C.    **DC Water's Review**

1.    *Bid Proposal Checklist*

DC Water screens bids initially with a bid proposal checklist. This checklist is a spreadsheet with two main sections. The first section lists certain forms and categories of documentation. J.A. 441. Next to each item are three boxes for denoting whether the documentation was required, received, or deficient. *Id.* The second section calculates the bidder's MBE and WBE participation rate based on the total value of the bid and the value of the bidder's proposed MBE and WBE subcontracts. *Id.* If those percentages are below the fair share objectives, the checklist denotes that the fair share objectives were not met. *Id.*

On April 27, 2016, the day the bid opened, Bryan Campbell of DC Water completed this checklist for Norair's bid. Campbell Decl. ¶ 3, Dkt. 27-2; J.A. 441. Campbell maintains that completing this checklist did not involve substantively reviewing Norair's bid for compliance with the IFB. Campbell Decl. ¶ 2. Instead, he checked whether "certain documents are included in bid submissions" but did not "analyze bid packages for sufficiency, completeness, or responsiveness." *Id.*

In completing the first section of the checklist, Campbell did not check the "deficiency" box for any of the items relating to the good faith efforts, including the "MBE & WBE Outreach Plan." J.A. 441. Campbell initially deemed the outreach plan not deficient because he saw in Norair's bid package "a one page memo dated April 25, 2016, entitled 'EPA six good faith efforts' and therefore checked the box on the checklist indicating that Norair . . . had included a[n] MBE/WBE outreach plan." Campbell Decl. ¶ 4. But because Campbell "had no responsibility for determining whether [Norair's] submission adequately responded to the requirements of [the] IFB," he "made no such determination." *Id.* In completing the second section of the checklist, Campbell calculated and noted that Norair's proposed MBE and WBE

subcontracts did not meet the fair share goal amounts.  J.A. 441.  Campbell provided his completed bid proposal checklist to DC Water employee Rhonda Green.  Campbell Decl. ¶ 6; Green Decl. ¶ 1, Dkt. 56-7.

       2.    *Communications with Gus Bass*

After completing the checklist, Campbell spoke by phone with Richard Norair, Norair's president.  Pl.'s Am. Compl. Ex. H ¶ 2, Dkt. 37-3 ("Norair Aff.");  Campbell Decl. ¶ 7.  The parties agree that the two discussed Norair's MBE and WBE percentages, not Norair's documentation of its good faith efforts, and that Campbell referred Norair to Gus Bass for further discussions.  Pl.'s Statement of Disputed Material Facts at 22–23; Def.'s Resp. to Pl.'s Statement of Undisputed Material Facts at 14–15, Dkt. 69.

Bass is a former DC Water employee who "had retired from DC Water in January earlier that year" but at the time was acting "as a part time consultant" to Leonard Benson, the Chief Engineer of DC Water.  Benson Decl. at ¶ 2, Dkt. 23.  According to DC Water, Bass "did not have [actual] authority to make [a] determination on behalf of DC Water as to bidders' compliance with bid requirements or as to the responsiveness or non-responsiveness of any bid."  Def.'s Statement of Undisputed Material Facts ¶ 45, Dkt. 56-4; Pl.'s Statement of Disputed Material Facts at 23–24.

Norair called Bass on May 2, 2016.  Norair Aff. ¶ 6.  Bass "reiterated the importance of meeting MBE/WBE objectives" and "suggested contacting a company called Ideal Electric for additional MBE/WBE participation."  *Id.* ¶ 7.  The conversation did not concern Norair's documentation of its good faith efforts.  *Id.* ¶ 8.

On the morning of May 10, 2016, Bass emailed Norair, "I need 32% MBE and 6% WBE participation today.  What percent do [you] have now?"  AR006337.  Norair quickly responded that he would call Bass shortly.  *Id.*  During that phone conversation, Bass asked Norair to show

increased MBE and WBE participation "by close of business that day."  Norair Aff. ¶ 9.

According to Norair, Bass also said that if "Norair was still unable to meet the 32% and 6%

objectives, then Norair would not receive the contract award."  *Id.*  DC Water does not appear to

deny this statement except "to the extent that [it] implies the MBE and WBE percentages created

a 'quota'" rather than mere "goals."  Def.'s Resp. to Pl.'s Statement of  Undisputed Material

Facts at 18.

Later that morning, Bass emailed several DC Water employees involved in Norair's

review, including Campbell, Rouben Derminassian, Diala Dandach, and John Carr, to say that

Norair "will be very close to meeting [its] fairshare objective."  AR6337.  Later that day, Norair

sent Bass "supplemental forms showing that Norair had found additional MBEs/WBEs and could

now meet the 32% and 6% objectives," Norair Aff. ¶ 10, and Norair admits that it "ultimately

achieved the Fair Share Objectives after submitting supplementary materials to Mr. Bass," Pl.'s

Statement of Disputed Material Facts at 25–26.  In another email that afternoon, Bass emailed

Derminassian, Carr, Dandach, and Campbell to say that he was ultimately "okay" with Norair's

MBE and WBE percentages.  AR6337.  But Bass did not tell those employees what Norair's new

percentages were and did not attach any supplemental forms from Norair showing improved

DBE percentages.  *Id.*

### 3.    *DC Water's Determination and Findings; Norair's Bid Protest*

A few hours after receiving Bass's email, Dandach emailed Green, Carr, and John

Bosley, DC Water's Chief Procurement Officer, about Norair's bid.  AR6666.  Dandach said she

understood that Bosley would "be providing a recommendation tomorrow," asked Green to

"make available [her] findings of the gaps/nonresponsive items," and quoted the good faith effort

requirements from the IFB.  *Id.*  As the Grants Management Specialist at DC Water for nearly 15

years, it is undisputed that Green was and is solely responsible for reviewing bid packages to

determine initially whether a bidder has complied with the DBE Program rules and the IFB. Green Decl. ¶¶ 1, 4–5.

The next day, on May 11, 2016, Green responded with her initial findings of the gaps and nonresponsive items in Norair's bid. AR6666. She explained that "the bid opening was April 27th, at which time the lowest bidder"—Norair—"did not comply with the 6 good faith efforts, did not meet [its] fair shair [*sic*] objective and did not submit a WBE at all. The Certification of Outreach was signed. As of today, there are no changes. The second bidder was in compliance." *Id.* Green later stated that she "alone made the initial determination that Norair's bid package failed to comply with [the IFB's] requirements to document good faith efforts to perform outreach and to employ MBEs and WBEs as subcontractors in its bid." Green Decl. ¶ 7.

By May 13, 2016, DC Water internally had deemed Norair's bid nonresponsive and thus decided to reject the bid. AR6650. It also began drafting a Determination and Findings ("D&F")—DC Water's formal recognition of its decision on a bid—and also a letter to Norair explaining this decision. *Id.*

DC Water asked David Meredith, an engineering consultant to DC Water, to prepare the first draft D&F. AR6639; Meredith Decl. ¶ 1–4, Dkt. 26-3. Meredith had not previously prepared a D&F, so he requested a sample from DC Water. *Id.* at 2. The samples he received cited a different federal law than the one governing this project and did not mirror the basis for DC Water's determination that Norair's bid was nonresponsive, which Meredith understood to be Norair's "failure to document its good faith efforts toward achieving the fair share objectives." *Id.* ¶ 2–3. Meredith nonetheless used these examples to prepare the first draft D&F. *Id.* ¶ 4. His draft explained that while "all other Bidders . . . can meet all Fair Share Objectives," Norair indicated that "it intended to subcontract work to MBE firms, a total of 6.83%, and WBE

firms, a total of 0.00%, which is not in accordance with the project Fair Share Objectives"; it did not mention insufficient documentation of good faith efforts. AR6641. Meredith sent his draft to Derminassian, Dandach, and Carr on May 18, 2016. AR6639.

That same day, DC Water notified Norair "by telephone" that its bid was nonresponsive "due to a failure to demonstrate good-faith efforts to obtain participation by certified WBE/DBE/MBE firms." AR4464; *see also* AR4461. Norair immediately filed a bid protest by letter. AR4464. Norair's protest argued that it had "satisfied" the good faith efforts and had "demonstrated a good-effort to obtain participation of DBEs." *Id.* It also contended that DC Water's determination "treats the applicable DBE goals as quotas, which is impermissible and unconstitutional." *Id.* But on June 2, 2016, DC Water told Norair by letter that because DC Water had not yet awarded the contract, Norair's bid protest was "premature." AR4544.

The next day, on May 19, 2016, Dandach sent a revised draft D&F to Carr and Bosley for review. AR6539. Dandach's draft made two key edits to Meredith's draft. First, it characterized Norair's MBE and WBE percentages as "substantially less than," rather than "not in accordance with," the "project Fair Share Objectives." AR6542. And second, it added that Norair's bid "failed to acknowledge and provide proof of employing the six Good Faith Efforts during bidding, which is a requirement of the EPA DBE Program." *Id.* Bosley and Carr edited the draft D&F further but retained these additions. AR6528–38.

On May 24, 2016, while finalizing the D&F, DC Water sent a letter to Norair notifying it that DC Water had reviewed its bid proposal and determined it to be nonresponsive for "not conform[ing] to the [IFB's] stated requirements." AR3764. The letter also cited Norair's "fail[ure] to provide the requisite proof regarding compliance with federal Fair Share Objectives (Outreach)" as grounds for the rejection. *Id.*

On May 31, 2016, George Hawkins, DC Water's General Manager, signed the final

D&F.  AR3763.  In rejecting Norair's bid, it explained:

> [T]he Bid Proposal submitted by Norair included forms indicating it intended to subcontract work to MBE firms, a total of 6.83%, and WBE firms, a total of 0.00%, which is substantially less than the project Fair Share Objectives.  In addition, Norair's Bid Proposal failed to acknowledge and provide proof of employing the six Good Faith Efforts during bidding, which is a requirement of the EPA DBE program.
>
> According to [the IFB], failure of a bidder to demonstrate compliance with good faith efforts in obtaining MBE/WBE participation constitutes cause for rejection of their proposal.  Accordingly, DC Water has determined that Norair's bid is non-responsive and recommends its rejection, and proceeding to the responsiveness evaluation of the second lowest bidder, American Contracting & Environmental Services, Inc.

AR3762.  DC Water then evaluated the next-lowest priced bid, found it to be responsive, and

awarded the contract to that bidder on July 7, 2016.  AR3669–78; AR3683–708.

With the contract awarded, Norair's earlier bid protest became ripe for DC Water's

consideration.  On July 26, 2016, DC Water denied Norair's protest by letter.  AR4460–63.  The

letter recounted the IFB's background and requirements, much as the Court has done here.

AR4460–61.  The letter then summarized Norair's arguments and documented DC Water's

rationale for rejecting them.  AR4461–62.  It explained that "following the good faith

efforts . . . is a mandatory requirement"; concluded that "Norair's minimal outreach efforts here

fell far short of what is required"; emphasized that though the MBE and WBE "percentages are

not mandatory," "the attempts to reach these percentages must be demonstrated"; and detailed

the deficiencies and omissions from Norair's documentation that justified its decision.  AR4462–

63.  Based on this reasoning, DC Water denied Norair's bid protest.  AR4463.

### D.     Procedural History of This Case

Norair filed its original complaint on August 4, 2016.  Dkt. 1.  On September 23, 2016, Norair filed a motion for preliminary injunction.  Dkt. 17.  On September 28, 2016, the preliminary injunction briefing was consolidated with a merits determination; that briefing was set to ripen on November 18, 2016.  *See* Minute Order of September 28, 2016.  On September 21, 2017, this case was stayed.  *See* Minute Order of September 21, 2017.

On December 4, 2017, this case was directly reassigned to Judge Dabney L. Friedrich. Subsequently, Norair to file a motion for leave to amend the complaint, Dkt. 37, which the Court granted, Dkt. 42.  In its amended complaint, Norair alleges that DC Water's unresponsiveness determination was irrational and violated two District of Columbia municipal regulations, a violation of the D.C. Administrative Procedure Act ("APA").  Am. Compl., Dkt. 42, ¶¶ 108–122. Norair also alleges that DC Water had a custom of applying an impermissible race- and gender-based quota to bid determinations that caused DC Water to deny Norair's bid, a violation of 42 U.S.C. § 1983.  *Id.* ¶¶ 98–107.  Norair seeks declaratory, injunctive, and monetary relief. *Id.* at 19.  After discovery, Norair moved for summary judgment, Pl.'s Mem. in Supp. of Pl.'s Mot. for Summ. J., Dkt. 53 ("Pl.'s Mem."), and DC water cross-moved for summary judgment, Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. at 1, Dkt. 56-3 ("Def.'s Mem.").  The Court now resolves both motions.

## II.     LEGAL STANDARD

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if a reasonable jury could determine that the evidence warrants a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it could change the litigation's substantive outcome.  *See id.*

When a party asserts either "that a fact *cannot be* or *is* genuinely disputed," it "must support the assertion by" either "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c) (emphasis added). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of facts as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e). And the court may "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." *Id.*

## III.    ANALYSIS

### A.    Administrative Claim

Norair urges that DC Water's decision was arbitrary and unlawful under two D.C. municipal regulations. The first provides that "[a] responsive bid is a response to a solicitation which conforms in all material respects to the solicitation." D.C. Mun. Regs. tit. 21, § 5312.3. And the second provides that DC Water "may award a contract to the responsible bidder who submits the lowest responsive bid." *Id.* § 5331.1.

The D.C. APA governs these claims. *See* D.C. Code § 2-501, *et seq.* This standard mirrors the federal APA standard and empowers this Court "[t]o hold unlawful and set aside any [administrative] action or findings and conclusions found to be . . . [a]rbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* at § 2-510(a)(3); *see also* 5 U.S.C. § 706(2)(A).

"In disappointed bidder cases" like this one, "the government is entitled to 'an especially deferential standard of arbitrary and capricious review.'" *Corel Corp. v. United States*, 165 F. Supp. 2d 12, 29 (D.D.C. 2001) (quoting *Iceland Steamship Co. v. U.S. Dep't of the Army*, 201 F.

3d 451, 457 (D.C. Cir. 2000)).  The plaintiff bears a "heavy burden" and must show "either that (1) the procurement official's decisions on matters committed primarily to his own discretion had no rational basis, or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations."  *Id.* (internal quotation omitted).

This deferential standard recognizes that courts "are ill-equipped to settle the delicate questions involved in procurement decisions" and thus requires that "an agency's procurement decision" satisfy nothing but "substantial compliance with applicable law and baseline substantive rationality."  *Elcon Enters., Inc. v. Washington Metro. Area Transit Auth.*, 977 F.2d 1472, 1479 (D.C. Cir. 1992).  This deference protects against courts becoming "the forum for all manner of objections to procurement decisions—objections that counsel can readily relate to the language of some provision or other in some procurement regulation—and would be propelled without adequate preparation into a tangle of complex statutory and decisional rules."  *Id.*

       *1.    Rationality*

Norair fails to show that DC Water's decision to deem Norair's bid nonresponsive—a matter committed primarily to DC Water's own discretion—had no rational basis.  *First*, the Court rejects any suggestion that the decision of whether Norair's documentary deficiencies and omissions were material and (and thus rendered the bid nonresponsive) was not committed primarily to DC Water's discretion.  It clearly was.  "A responsive bid . . . conforms in all material respects to the solicitation."  21 DCMR § 5312.3.  And "the determination of whether a defect in a bid is material"—and thus whether the bid is responsive—"is committed to agency discretion."  *Urban Dev. Sols., LLC v. District of Columbia*, 992 A.2d 1255, 1267 (D.C. 2010). The IFB expressly required bidders to document their good faith efforts and warned that failure to do so "may be cause to declare the bid to be non-responsive."  AR1595.  This provision

clearly contemplates that some documentary deficiencies and omissions could be material, and this determination was committed primarily to DC Water's discretion.

*Second*, Norair fails to show that DC Water's decision on this matter—that Norair's documentation was inadequate and thus rendered the bid nonresponsive—was irrational. Norair's bid package did little more than conclusively state that it had complied with the good faith efforts and related IFB requirements. *See, e.g.*, AR2926–28; AR2963. Some of the documentation that Norair did submit was deficient, and Norair included little or no evidence that it complied with several of the IFB's other requirements. For example:

- Norair was required to "[i]nclude in the submitted documentation minority business and women enterprises that were solicited as potential subcontracting sources." AR1595. But Norair's DBE Contacts Made chart, which purports to satisfy this requirement, did not specify whether the businesses contacted were MBEs or WBEs. Pl.'s Statement of Disputed Material Facts at 15.

- The IFB required Norair to "[u]se the services and assistance of the [Small Business Administration (SBA)] and the Minority Business Development Agency of the Department of Commerce." 40 C.F.R. § 33.301. But Norair included no documentation corroborating that it had utilized the SBA or the Minority Business Development Agency. *Id.* at 14.

- The IFB also required Norair to contact the District Department of Transportation and the U.S. Department of Transportation during the search for DBEs. AR1595. But Norair's bid package appears not to contain documentation showing that Norair contacted those agencies. *See generally* AR2916–88.

- The IFB required Norair to "[e]nsure DBEs are made aware of contracting opportunities to the fullest extent practicable through outreach and recruitment activities. . . ." 40 C.F.R. § 33.301. But Norair included no "documentation that it had advertised MBE/WBE subcontracting opportunities in a newspaper, trade publication, online portal, or website." Pl.'s Statement of Disputed Material Facts at 12.

- The IFB "[e]ncourage[d]" Norair to "contract[] with a consortium of DBEs when a contract is too large for one [DBE] to handle individually." 40 C.F.R. § 33.301. But Norair included no "[d]ocuments relating to [Norair's] attempts to contract with a consortium of M/WBE subcontractors" or reasoning for not contracting a consortium of DBEs. *Id.* at 13.

- The IFB required Norair to "whenever possible, [to] post[] solicitations for bids or proposals for a minimum of 30 calendar days before the bid or proposal closing date." 40 C.F.R. § 33.301. But the DBE Contacts Made chart shows that Norair made many of its solicitations well short of 30 days before the bid closed, and Norair's bid does not show why meeting the 30-day minimum was impossible. AR2964–65.

Based on these deficiencies and omissions, DC Water rationally concluded that Norair's bid "fail[ed] . . . to demonstrate compliance with good faith efforts in obtaining MBE/WBE participation," which rationally "constitute[d] cause for rejection." AR3762.

The Court rejects Norair's counterarguments. *First*, Norair is incorrect that DC Water rests on impermissible *post hoc* rationalizations in citing these deficiencies and omissions as grounds for denying Norair's bid. Norair contends because DC Water did not list these specific deficiencies and omissions in its D&F it may not cite them now. *See* Pl.'s Reply at 7–9. But the "rule against post-hoc rationalizations does not prevent a court from considering a more detailed explanation of an agency's action in response to a legal challenge." *See Nat'l Oilseed Processors Ass'n v. Browner*, 924 F. Supp. 1193, 1204 (D.D.C. 1996). A court "will 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 814 (D.C. Cir. 1983) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)). So "long as the agency does not present a new basis for its action, it may supply a clearer or more detailed explanation" in litigation. *Browner*, 924 F. Supp. at 1204. "The key distinction is the difference between a post hoc *rationalization*, which is a new rationale for an agency action, and a post hoc *explanation*, which is an agency's discussion of the previously articulated rationale for the challenged action. Post hoc rationalizations are precluded; post hoc explanations are not." *Id.* (emphasis added).

DC Water's list of documentary deficiencies and omissions is explanation, not rationalization. In its final D&F, DC Water stated that Norair's "fail[ure] to acknowledge and provide proof of employing the six Good Faith efforts during bidding" was a primary rationale for denying the bid. AR3762. DC Water advances this same rationale in its briefs. It does not present a *new* basis for its decision but instead "present[s] in its briefs a [more] fulsome description of the basis for [its decision] and . . . direct[s] the Court to the relevant supporting portions of the administrative record." *Browner*, 924 F. Supp. at 1205. Such explanations are proper.

*Second*, the Court also rejects Norair's assertion that DC Water's purported basis for denying Norair's bid—Norair's failure to document and comply with the good faith efforts—was unlawful pretext. Norair's evidence for pretext is the allegation that DC Water initially decided to deny Norair's bid for not meeting the Fair Share Objectives but adopted this pretextual rationale "after Norair protested DC Water's decision." Pl.'s Mem. at 28–29.

This sort of pretext claim "is a quintessential allegation of bad faith." *MG Altus Apache Co. v. United States*, 111 Fed. Cl. 425, 450 (2013). Such claims face heavy skepticism. Courts presume that government officials act in good faith, and a "[p]laintiff must present well-nigh irrefragable proof of bad faith or bias on the part of government officials in order to overcome this presumption." *China Trade Ctr.*, 34 F. Supp. 2d at 70.

Norair offers no such proof. To support its alleged timeline, Norair cites just three sets of record evidence: Bryan Campbell's checklist; Gus Bass's communications with Norair; and David Meredith's first draft of the D&F. *See* Pl.'s Mem. at 28–29. But this evidence falls far short of presetting "well-nigh irrefragable proof of bad faith." First, Norair has not shown that Campbell's review was substantive. Norair disputes Campbell's account that his review was

non-substantive.  Pl.'s Statement of Disputed Material Facts at 8.  If Norair is correct, it contends that this would show that DC Water initially deemed Norair's supporting documentation to be substantively sufficient and planned to deny Norair's bid for failing to meet impermissible quotas.  *Id.*  But the only record evidence Norair cites for its claim—Campbell's initial screening checklist—does not establish that Campbell performed a substantive review.  The checklist simply lists three blank boxes for "required," "received," and "deficient" and appears to be nothing more than a basic screening of whether Norair had correctly submitted certain forms and a mechanical calculation of whether Norair's MBE and WBE percentages met the fair share objectives.  J.A. 441.  In addition, there is no record evidence that Campbell made an initial or final determination of bid responsiveness.

Next, Gus Bass's communications are a red herring because Norair admits that Bass had no *actual* authority in deciding whether to award the bid to Norair, *see* Pl.'s Statement of Disputed Material Facts at 23–24, and the extent of Bass's *apparent* authority is irrelevant because "the doctrine of apparent authority does not apply to dealings with the government," *Monument Realty LLC v. Wash. Metro Area Transit Auth.*, 535 F. Supp. 2d 60, 70 (D.D.C. 2008).  Not only that, but Gus Bass ultimately said that he was satisfied with Norair's MBE and WBE percentages, and yet DC Water still denied Norair's bid.

Finally, Meredith's draft likewise fails to support Norair's timeline.  Two days *before* Meredith completed his draft, Rhonda Green indicated that Norair's insufficient good faith efforts motived, at least in part, her recommendation to deny Norair's bid.  AR6666.

And beyond these problems with Norair's evidence, Norair's own bid protest letter to DC Water is most telling of all.  It states: "Norair was informed by telephone on May 18, 2016 that our bid was found to be non-responsive due to a *failure to demonstrate good-faith efforts* to

obtain participation by certified WBE/DBE/MBE firms." AR4464 (emphasis added). This alone

refutes Norair's argument that its bid protest caused DC Water to adopt the "pretextual"

rationale. For all these reasons, Norair has not established that DC Water's stated rationale was

pretext disguising some other, impermissible rationale.

### 2.    *Clear and Prejudicial Violation of Regulations*

For largely the same reasons, Norair also has failed to show "that the procurement

procedure involved a clear and prejudicial violation of applicable statutes or regulations." *Corel

Corp.*, 165 F. Supp. 2d at 29.

*First*, DC Water did not clearly violate 21 DCMR § 5312.3, which provides that "[a]

responsive bid is a response to a solicitation which conforms in all material respects to the

solicitation." An omission is material if it violates an express provision of the IFB and that

provision serves a substantive purpose. *ManTech Advanced Sys. Int'l v. United States*, 141 Fed.

Cl. 493, 506 (2019). As mentioned, the IFB expressly required documentation of a bidder's

good faith efforts. And that requirement served the substantive purpose of allowing DC Water to

determine whether a bidder had complied with the EPA's requirements. Thus, Norair's failure to

comply with this requirement was material, and DC Water did not clearly violate 21 DCMR

§ 5312.3 in concluding as much.

*Second*, DC Water did not clearly violate 21 DCMR § 5331.1 either, which provides

that an agency "may award a contract to the responsible bidder who submits the lowest

responsive bid."[3] As explained, DC Water rationally determined that Norair's bid was

nonresponsive, so DC Water could not have awarded the contract to Norair under § 5331.1 even

---

[3] Norair's amended complaint incorrectly suggests that § 5331.1 uses the word "must" rather
than "may." *Compare* Am. Compl. ¶ 110 *with* 21 DCMR § 5331.1.

if it had wanted to.  More fundamentally, neither § 5331.1 nor the IFB require DC Water to

award the bid to anyone—even to the lowest responsive bidder.  Section 5331.1 is permissive—it

says *may*, not *must*.  And under the IFB, "DC Water reserve[d] the right to reject any or all Bids"

and would grant an "award, *if any*, to the lowest qualified, responsible, and responsive bidder."

AR1584 (emphasis added).  Thus, Norair is incorrect that "so long as [its] bid was responsive it

should have received the contract."  Pl.'s Mem. at 26.

   *Third*, DC Water did not clearly violate the IFB.  Norair says that—regardless of what

documentation Norair actually omitted—DC Water unlawfully and irrationally required more

documentation than the IFB required.  Norair recognizes that the IFB requires bidders to "submit

with their bid . . . their plan and documentation of their WBE/MBE outreach plan efforts to

comply with the Fair Share Objectives."  AR1595.  But Norair says that the IFB went on to

define the documentation that satisfies this requirement when it told bidders to "[i]Include in the

submitted documentation minority business and women enterprises that were solicited as

potential subcontracting sources and the bidder's evaluation of each MBE and WBE

subcontractor proposal received."  *Id.*  Under Norair's reading, compliance with this second,

narrower documentation requirement equals compliance with the first, broader documentation

requirement.

   But the Court rejects that interpretation because it would render the broader requirement

meaningless.  The better interpretation (and the one that DC Water has reasonably adopted) is

that by using the word "include," the narrower documentation requirement merely specifies

documentation is *necessary*—but not *sufficient*—for a responsive bid.  It was neither irrational

nor unlawful for DC Water to conclude that compliance with the narrower requirement would

not automatically constitute compliance with the IFB's other, broader and independent

requirement that bidders "submit with their bid . . . their plan and documentation of their WBE/MBE outreach plan efforts to comply with the Fair Share Objectives." *Id.*

*Finally*, for the reasons explained below, Norair has not shown that DC Water violated the Constitution in denying Norair's bid. *See infra* III.B.1.

## B.    Section 1983 Claim

Norair also claims that a DC Water custom of using unconstitutional race- and gender-based quotas to award construction contracts caused DC Water to use such a quota to deny Norair's bid. Title 42, Section 1983 governs this claim. It imposes civil liability on municipalities and local governments that violate a plaintiff's federal constitutional rights. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978). But municipalities are liable under § 1983 "only for their *own* illegal acts. They are not vicariously liable under § 1983 for their employees' actions." *Doe v. District of Columbia*, 796 F.3d 96, 105 (D.C. Cir. 2015) (internal quotation marks omitted). A § 1983 claim thus requires showing: (1) the existence of a predicate constitutional violation; and (2) that a municipal policy or custom caused that constitutional violation. *See Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003).

To elaborate on the second element: A *policy* is something formal—*i.e.*, a "policy statement, ordinance, regulation, or decision formally promulgated" by the municipality. *Olatunji v. District of Columbia*, 958 F. Supp. 2d 27, 35 (D.D.C. 2013). A *custom* is something informal but pervasive—*i.e.*, "a practice so permanent and well settled as to constitute a custom or usage with [the] force of law." *Id.* (internal quotation marks omitted). And establishing that the policy or custom *caused* the predicate constitutional violation requires showing an "affirmative link" between the policy or custom and the violation, "such that [it] was the moving force behind the constitutional violation." *Baker*, 326 F.3d at 1306 (internal quotation and citation omitted). "In this circuit, a municipal policy is deemed to be the moving force of a

constitutional injury if the conduct is a substantial factor in bringing about harm." *Parker v. District of Columbia*, 850 F.2d 708, 714 (D.C. Cir. 1988). Proving causation is "often an even more difficult hurdle" than proving a policy or custom. *Cox v. District of Columbia*, 821 F. Supp. 1, 17 (D.D.C. 1993), as amended (May 21, 1993), aff'd, 40 F.3d 475 (D.C. Cir. 1994).

No reasonable jury could conclude that Norair suffered a predicate constitutional violation or that, even if it had, a DC Water custom or policy caused that violation.

### 1.    *Predicate Constitutional Violation*

Norair's § 1983 claim fails at step one. Had DC Water used a mandatory race- and gender-based quota to deny Norair's bid, that decision would face strict scrutiny and possibly be deemed unconstitutional. *See, e.g.*, *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995). But there is no genuine dispute: DC Water did not use such a quota to deny Norair's bid.

As explained above, the administrative record clearly shows that DC Water denied Norair's bid for failing to document its good faith efforts, not because Norair failed to meet a mandatory race- and gender-based quota.

And the other evidence before the Court accords with the administrative record. Rhonda Green declared that she deemed Norair's bid package nonresponsive for "fail[ing] to comply with [the IFB's] requirements to document good faith efforts to perform outreach and to employ MBEs and WBEs as subcontractors." Green Decl. ¶ 4. Norair's own president testified that the bid omitted documentation to support Norair's compliance with several good faith efforts. *See* Def.'s Mem. Ex. 4, Dkt. 56-9 ("Norair Depo.") at 101:3, 104:15–18 (discussing omission of documentation of soliciting MBEs and WBEs in newspapers or trade publications); *id.* at 110:14–18, 111:21–112:2 (discussing omission of documentation of efforts to contact the Small Business Administration); *id.* at 107:13–109:16 (discussing omission of documentation of contacts with DBE agencies and Minority Business Development Agency). He also affirmed

that Norair ultimately *met* the supposed quotas, *see* Norair Aff. ¶ 10, and yet DC Water still deemed Norair's bid nonresponsive.  It is beyond genuine dispute that Norair suffered no predicate constitutional violation; Norair's § 1983 claim fails on this basis alone.

### 2.    Policy or Custom that Caused the Violation

Norair's § 1983 also fails at step two.  Norair contends that DC Water had a custom (but not a policy) of applying a mandatory race- and gender-based quota to bid decisions.  Pl.'s Mem. at 35.  DC Water disagrees.  Def.'s Mem. at 28.

But the Court need not resolve whether that dispute is genuine because Norair has identified no evidence that such a custom—even if it did exist—was "a substantial factor in bringing about" DC Water's decision to deem Norair's bid nonresponsive.  *Parker*, 850 F.2d at 714.  Norair's summary judgment brief merely declares, without citation, that DC Water's "practice" of applying quotas "deprived Norair of its Equal Protection rights."  Pl.'s Mem. at 39–40.  And Norair's reply is similarly conclusory on causation, arguing simply: "Here, Norair has established [that it] would not have suffered from a deprivation of its right to Equal Protection had D.C. Water not applied the Fair Share Objectives as a mandatory quota."  Pl.'s Reply at 37.  But Norair has identified *no evidence* that such a custom—rather than the actions or whims of individual employees—caused DC Water to deny Norair's bid.  *See Doe*, 796 F.3d at 105 (holding that a municipality is not vicariously liable for even unconstitutional actions of individual employees).

To the contrary, it is undisputed that Norair ultimately met the fair share objectives.  Pl.'s Statement of Disputed Material Facts at 25–26 ("Plaintiff agrees that Norair ultimately achieved the Fair Share Objectives after submitting supplementary materials to Mr. Bass."); *see also* Norair Aff. ¶ 10.  For this and all the other reasons discussed above, the evidence shows that Norair's failure to adequately document its compliance with the good faith efforts caused DC

23

Water's decision, not a custom of applying an unconstitutional quota. No reasonable juror could conclude otherwise. Norair thus has not cleared the "difficult hurdle" of establishing causation, and thus its § 1983 claim fails on this additional ground. *Cox*, 821 F. Supp. at 17.

## CONCLUSION

DC Water's decision shows "substantial compliance with applicable law and baseline substantive rationality." *Elcon Enters., Inc.*, 977 F.2d at 1479. And no reasonable jury could conclude that Norair suffered a predicate constitutional violation or that, even if it had, a DC Water custom caused that violation. Thus, the Court will deny Norair's Motion for Summary Judgment and grant DC Water's Cross-Motion for Summary Judgment. A separate order consistent with this decision accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

February 26, 2020